106 P.3d 443

**CLEAR LAKES TROUT COMPANY, INC., Plaintiff–Appellant,**

v.

**CLEAR SPRINGS FOODS, INC., Defendant–Respondent.**

No. 30023.

Supreme Court of Idaho, Boise, December 2004 Term.

Jan. 28, 2005.

Ringert, Clark, Chtd., Boise, for appellant. Daniel V. Steenson argued.

Barker, Rosholt & Simpson, LLP, Boise, for respondents.   John K. Simpson argued.

KIDWELL, Justice Pro Tem.

This is an action for breach of contract. The dispositive issue is whether the Safe Harbor provision contained in the Interim Stipulated Agreement (Agreement), which limits the rights of the parties to pursue actions against other parties for curtailment of water, prohibited Clear Springs Foods, Inc. (Springs) from seeking curtailment of Clear Lakes Trout Company Inc.'s (Lakes) water rights. The district court granted Springs' Motion for Summary Judgment, holding Springs' water delivery call did not violate the Agreement.   This Court affirms the decision of the district court.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Lakes and Springs operate fish hatcheries on adjacent parcels below the rim of the Snake River Canyon near Buhl, Idaho. In the 1960s and 1970s the parties began submitting applications for permits to appropriate water for fish propagation purposes from springs that flow from the canyon walls above the Snake River. The parties became engaged in litigation before the Snake River Basin Adjudication (SRBA) District Court regarding the priority of water rights and the identification of water right sources. The Idaho Department of Water Resources (IDWR) filed a Director's report with the SRBA District Court, recommending adjudication of priorities. The report was adopted by the SRBA Special Master, the SRBA District Court and by the Idaho Supreme Court in *Clear Springs Foods, Inc. v. Clear Lakes Trout Co.*, 136 Idaho 761, 40 P.3d 119 (2002). The adjudication gave Lakes the first priority to draw 100 cubic feet per second (cfs) (water right no. 36–02569, priority date 6/23/1966), Springs the second priority right to draw 200 cfs (water right no. 36–02708, priority date 9/28/1966), and Lakes the third priority to draw 75 cfs (water right no. 36–07004, priority date 7/21/1967).

Due to a declining supply of water flowing from the springs, the Director issued a notice in August 2001, during the final stages of litigation regarding the priority rights of Lakes and Springs. The notice stated that the IDWR intended to curtail some of the ground water users diverting above the canyon rim due to inadequate ground water supply caused by severe drought conditions that began in 2000 and continued through 2001. This notice motivated ground water users and surface water users to negotiate the Interim Stipulated Agreement, which was signed by several ground water users and several surface water users dependent upon water discharged from the springs. The ground water users agreed to provide up to 40,000 acre-feet of water per year to enhance the flows. The term of the Agreement was two years. By January 2002, Lakes and Springs, both surface water users, had signed the Agreement.

On June 7, 2002, Springs submitted a written call for the distribution of water, which would curtail Lakes' water rights. On June 19, 2002, the Watermaster sent a Notice of Intent to Redistribute Flows to Lakes and Springs. The letter gave notice that the Watermaster intended to reduce Lakes' diversion by 27 cfs in 14 days. It also advised Lakes that it could file a petition with the IDWR Director within 15 days seeking a hearing pursuant to I.C. § 42–1701A(3).

Lakes filed suit in district court on June 20, 2002, to enjoin the proposed curtailment of its water rights, naming IDWR, the Director and the Watermaster for Water District 130 (collectively "IDWR") as defendants. Lakes' motion for a preliminary injunction to enjoin the curtailment of its water was denied and the Watermaster adjusted the headgate in July 2002. The curtailment forced Lakes to remove nearly 300,000 pounds of trout from its raceways, idling approximately 17 percent of its hatchery. On July 22, 2002, Springs' Motion to Intervene in the lawsuit as a matter of right pursuant to I.R.C.P. 24(a) was granted. On December 9, 2002, IDWR and Lakes filed a stipulation for dismissal of the action; Springs was not a party to the stipulation. On December 12, 2002, the district court entered its order dismissing the lawsuit with prejudice pursuant to the terms of the stipulation.

Just prior to the dismissal, Lakes filed a Complaint on December 10, 2002, for breach of the Agreement by Springs. Lakes sought nullification of Springs' water delivery call and damages. On January 21, 2003, Springs filed its Answer and Motion to Dismiss arguing the suit was barred by the doctrine of res judicata due to the dismissal of Lakes' lawsuit to enjoin the IDWR from curtailing its water rights. The district court denied the motion on March 26, 2003, finding the prior dismissal did not bar Lakes' suit against Springs, and Springs filed a motion for reconsideration. Lakes filed a motion for partial summary judgment, arguing Springs breached the Agreement. Springs filed a cross-motion for summary judgment, alleging

no breach occurred. On June 3, 2003, Lakes filed a joint Reply/Response Brief regarding the cross-motions for summary judgment and attached the affidavit of Ms. Josephine Beeman, attorney for the North Snake Ground Water District, in which she discussed different drafts of the Agreement. On June 6, 2003, Springs filed a Motion to Strike Affidavit of Beeman. On July 15, 2003, the district court entered three orders. The court granted Springs' Motion to Strike Affidavit of Beeman. It denied Springs' Motion for Reconsideration. It held the Agreement did not prohibit Springs from seeking curtailment of Lakes' water rights, granted Springs' Motion for Summary Judgment and denied Lakes' Motion for Partial Summary Judgment. Lakes timely appealed to this Court.

## II.

### STANDARD OF REVIEW

■ On appeal from the grant of a motion for summary judgment, this Court employs the same standard as used by the district court originally ruling on the motion. *Scona, Inc. v. Green Willow Trust*, 133 Idaho 283, 286, 985 P.2d 1145, 1148 (1999). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). This Court exercises free review over the entire record which was before the district court to determine whether either side is entitled to judgment as a matter of law. *Id.* *Daugharty v. Post Falls Highway Dist.*, 134 Idaho 731, 733, 9 P.3d 534, 536 (2000).

## III.

### ANALYSIS

A. **The District Court Did Not Err When Granting Springs' Motion For Summary Judgment.**

■ In construing a contract, this Court should seek to give effect to the intention of the parties. *Daugharty*, 134 Idaho at 735, 9

P.3d at 538. To determine the intent of the parties, the contract must be viewed as a whole and in its entirety. *Id.* If the terms of the contract are clear and unambiguous, the interpretation of their meaning and legal effect are questions of law. *Opportunity, L.L.C. v. Ossewarde*, 136 Idaho 602, 605, 38 P.3d 1258, 1261 (2002). The meaning of an unambiguous contract should be determined from the plain meaning of the words. *Id.* Only when the language is ambiguous, is the intention of the parties determined from surrounding facts and circumstances. *Gardner v. Fliegel*, 92 Idaho 767, 771, 450 P.2d 990, 994 (1969).

■ As a preliminary issue, we agree with the parties and the district court's conclusion that the Agreement is unambiguous. The intent of the parties is determined from the plain meaning of the words. Therefore, the affidavit of Josephine Beeman, in which she discusses specific changes made to the Agreement during the drafting process, is not relevant. Idaho Rule of Civil Procedure 56(e) requires affidavits to "set forth facts as would be admissible in evidence." Because the affidavit deals with the intent of the parties during the negotiation and drafting phase, this Court agrees with the district court's finding that the affidavit is not admissible evidence and will not be considered to interpret the meaning of the Agreement.

■ The dispute between Lakes and Springs concerns the Safe Harbor provision contained of the Agreement, which limits the rights of parties to pursue actions against other parties for curtailment of water. In July 2002, Springs' written call for the distribution of water was granted, which curtailed Lakes' water rights. Lakes contends it is protected by the Safe Harbor provision, while Springs argues the provision was not intended to benefit junior surface water right holders, such as Lakes. The provision states:

2.8 Safe Harbor: In exchange for the commitments enumerated in paragraphs 2.1 through 2.7 the undersigned holders of senior priority surface water rights and their representatives agree not to seek either judicially or administratively the

curtailment or reduction, other than as provided in paragraph 2.7, of *any junior water rights held by or represented by the undersigned* within Basin 36 for the term of this agreement.

(Emphasis added.) Lakes asserts the phrase "any junior water rights" in the fifth line of the provision refers to every party that signed the Agreement, including junior surface water right holders. Springs argues the phrase refers only to junior ground water right holders.

To determine the parties' intentions regarding the extent of the protection provided by the Safe Harbor provision, the Agreement must be considered in its entirety. The Agreement begins by stating it "is entered into *between* the undersigned ground water users and surface water users ... in consideration of the promises stated in [the] Agreement." (Emphasis added.) Lakes contends the introductory phrase only identifies that the signatories include both ground water users and surface water users and the district court mischaracterized the Agreement as between ground water users on one side of the Agreement and surface water users on the other side. Springs argues the phrase clearly identifies the two sets of parties entering the Agreement. The next section states the Agreement was "made in reference to" the following facts:

1.1 The Director of the Idaho Department of Water Resources (Director) stated his intent to entirely curtail diversions under certain water rights for ground water beneath portions of Basin 36, an administrative sub-basin. The Director's intent was based upon his findings, set forth in his administrative order designating the Thousand Springs Ground Water Management Area dated August 3, 2001, that diversions of ground water under such rights cause significant reductions in spring flows tributary to the Thousand Springs reach of the Snake River, and that those reductions will further reduce the diminished water supply available to satisfy senior priority surface water rights during current drought conditions.

1.2 The parties are unable to agree to the extent of interconnection of ground water and surface water sources in the Snake River Basin and any alleged injury to surface water rights as a result of the diversion of water from the Eastern Snake Plain Aquifer (ESPA);

1.3 The Idaho Department of Water Resources (IDWR) has committed to complete reformulating and recalibrating the ESPA Ground Water Model by December 31, 2003, contingent on continued funding from the Idaho Legislature and other entities;

1.4 The new ESPA Ground Water Model is expected to provide the parties with additional information regarding the alleged impacts of ground water diversions from the ESPA on spring discharges and flows in defined reaches of the Snake River; and

1.5 The parties desire to avoid the need for litigation at this time on the nature and extent of the alleged injury to senior priority surface water rights caused by diversions of ground water or surface water under junior priority water rights within Basin 36 pending the completion of the new ESPA Ground Water Model. The parties understand that this agreement and IDWR administrative actions described in this agreement may include water rights in areas immediately adjacent to Basin 36 as necessary to respect geohydrologic characteristics and water user organization boundaries. All subsequent references to Basin 36 in the agreement include this qualification.

Sections 2.1 through 2.7 regard the details of providing replacement water. They state that ground water users agree to purchase when available, 40,000 acre-feet of water from rental pools as replacement water. They state that surface water rights (including the purchased water), water from sediment ponds and wastewater is to be used in lieu of ground water. When replacement water is not available, the Agreement provides ground water users a formula by which curtailment would occur. The Agreement also provides that the costs of the additional water will be apportioned among the ground

water users. As previously discussed, section 2.8 is the Safe Harbor provision. Section 2.9 provides that ground water users "do not concede that diversions of ground water are causing injury to senior priority surface water rights, nor do the undersigned holders of senior priority surface water rights and their representatives concede that the amount of replacement water accepted under this stipulated agreement compensates for the extent of the injury they allege.". Sections 2.10 through 2.12 discuss details relating to the parties' responsibilities to not oppose the State of Idaho's request in the SRBA Court for the Director to implement the interim administration and to cooperate with the Director in creating the water district. Section 2.13 provides a method for parties to become protected by the Safe Harbor provision. It states:

2.13  *Other junior water right holders* not members of NSGWD or MVGWD who desire the safe harbor protections of this agreement may join this agreement upon agreeing to pay a proportionate share of the costs and to be bound by all other terms of this agreement.

(Emphasis added.) Springs argues this paragraph clearly refers to junior ground water right users. This appears to be what the Agreement provides since both NSGWD and MVGWD are ground water users and only ground water users were intended to pay costs associated with replacement water. However, even if section 2.13 was intended to include junior surface water right holders, Lakes is not entitled to the protection provided by the Safe Harbor provision since there is no indication Lakes agreed to pay a proportionate share of costs.

Section 3, titled "Process for Future Conflicts," states that the parties agree to share information and develop a process for determining the extent of any injury "caused by ground water diversions in the Basins under junior priority water rights to senior priority surface water rights." Section 4 of the Agreement provides that the Director intends to approve the Agreement in lieu of issuing curtailment orders and that the SRBA District Court will enforce the Agreement upon the issuance of an order for in-

terim administration of water rights within Basin 36. The fifth section titled, "Disclaimers," states the following:

This Agreement represents a settlement of disputed issues regarding the administration of water rights from interconnected ground water sources and surface water sources within portions of the Snake River Basin. The undersigned are unable to agree on the extent and locations of interconnections of ground water and surface water sources in the Snake River Basin along the reach of the Snake River along and above the Thousand Springs reach of the Snake River and the extent of injury, if any, to senior priority surface water rights as a result of ground water diversions from the ESPA under junior priority water rights. In order to avoid litigation of these issues at this time, the undersigned have entered into this Agreement. Because this Agreement does not fully resolve the issues, the parties agree that this Agreement shall not be construed or interpreted so as to waive or prejudice any contention by any party regarding the legal or factual relationship between water rights from surface and ground water sources in the Snake River Basin along and above the Thousand Springs reach of the Snake River.

The final two sections of the Agreement provide for the dismissal or stay of particular pending actions, in addition to several general provisions, such as the role of section headings and the date the Agreement became effective.

We agree with the district court's conclusion that "based upon the plain and unambiguous language of the contract . . . the Agreement was made between a group of ground water users on one hand and a group of surface water users on the other hand." The Agreement facilitated a way for ground water users to avoid the threat of complete curtailment by the Director. The Agreement provides several details regarding how the ground water right holders would provide replacement water for senior surface water right holders, such as Lakes and Springs, in exchange for the promise of senior surface water right holders to refrain

from seeking curtailment of junior ground water right holders. The first phrase of the Safe Harbor provision is consistent with the position that the Agreement was made between a group of ground water users and a group of surface water users; it states, "In exchange for the commitments enumerated in paragraphs 2.1 through 2.7" the senior surface water right holders would not seek curtailment of junior water rights. The commitments referred to are the promises of ground water users to provide up to 40,000 acre-feet of replacement water when available. Lakes asserts the promise to not seek curtailment of water also protects its junior surface water rights, though nothing in sections 2.1 through 2.7 discusses the commitments of junior surface water right holders. Though unlikely, section 2.13 may have provided an opportunity for junior surface water right holders to protect themselves under the Safe Harbor provision. It mandates that a junior water right holder must pay a proportionate share of costs associated with water replacement in order to gain safe harbor protection, which Lakes has not.

The intention of the parties, as gathered from the entire Agreement, was that only junior ground water users were to be protected by the Safe Harbor provision. We affirm the district court's ruling in favor of Springs. This analysis precludes the necessity of addressing Springs' additional argument that Lakes is barred from bringing this action under the doctrine of res judicata.

**B. Springs Is Not Entitled To Attorney Fees On Appeal Pursuant To I.C. § 12–121.**

 Idaho Code § 12–121 provides that a judge may award attorney fees to the prevailing party. Such an award is appropriate when the appeal was brought frivolously, unreasonably or without foundation. *Merrill v. Gibson*, 139 Idaho 840, 846, 87 P.3d 949, 955 (2004) (citing *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979)). Springs requests attorney fees on appeal, asserting the "facts of this appeal demonstrate that the defense of res judicata is blatantly apparent." Springs' Motion for Dismissal and Motion for Reconsideration, in

which Springs argued the case was barred due to prior lawsuits involving Lakes, were both denied by the district court. Therefore, even if this Court found the defense of res judicata appropriate, the defense is not "blatantly apparent." We deny Springs' request for attorney fees on appeal.

## VI.

## CONCLUSION

This Court finds the Agreement did not prohibit Springs from seeking curtailment of Lakes' water rights. We affirm the district court's decision to grant Springs' Motion for Summary Judgment. We deny Springs' request for attorney fees on appeal. Costs are awarded to Respondent Springs.

Chief Justice SCHROEDER and Justices TROUT, EISMANN and SCHILLING, pro tem concur.